**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                            :
STEPHEN LANE,               :
                            :    CIVIL ACTION NO. 06-5819 (MLC)
      Plaintiff,            :
                            :    MEMORANDUM OPINION
      v.                    :
                            :
UNUM LIFE INSURANCE COMPANY :
OF AMERICA,                 :
                            :
      Defendant.            :
_____:
```

**COOPER, District Judge**

Plaintiff, Stephen Lane, brought an action against defendant, Unum Life Insurance Company of America, in New Jersey state court alleging breach of contract.  (Dkt. entry no. 1, Rmv. Not., Ex. A., Compl.)  Defendant removed the action to this Court on the basis of preemption under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001, et seq.  (Rmv. Not.)  Plaintiff now moves for summary judgment pursuant to Federal Rule of Civil Procedure ("Rule") 56(c).  (Dkt. entry no. 9).  Defendant opposes and cross-moves for summary judgment.  (Dkt. entry no. 10.)  For the reasons stated herein, the Court will (1) deny plaintiff's motion for summary judgment, and (2) grant defendant's cross motion for summary judgment.

**BACKGROUND**

**I.   The Plan**

Defendant issued a policy of group long-term disability insurance to Cherry Valley Country Club ("CVCC") in 2001.  (Dkt.

entry no. 10, Def. Statement of Uncontested Material Facts ("Def. Facts"), at ¶ 1.)  This policy funded an employee welfare benefit plan that provided long-term disability insurance coverage to eligible CVCC employees (the "Plan").  (Id. at ¶ 2.)  The Plan provides eligible employees a monthly benefit of 60% of monthly earnings, not to exceed the maximum monthly benefit of $5,000, less deductible sources of income and disability earnings.  (Dkt. entry no. 10, Aff. of Jennifer Foster ("Foster Aff."), Ex. 1, Long Term Disability Plan ("Plan"), at B@G-LTD-1.)

An employee only becomes eligible for disability benefits under the Plan on the date of either (1) the plan effective date, or (2) the day after the employee completes a "waiting period", whichever is later.  (Id. at EMPLOYEE-1.)  The "waiting period" is defined as "the continuous period of time (shown in each plan) that [the employee] must be in active employment in an eligible group before [the employee is] eligible for coverage under a plan."  (Id. at GLOSSARY-4.)  Under the Plan, the "waiting period" for employees entering an eligible group after May 1, 2001, is the "[f]irst of the month coincident with or next following 3 months of continuous active employment".  (Id. at B@G-LTD-1.)  "Active employment" means that the employee is working for CVCC for "earnings that are paid regularly" and the employee is "performing the material and substantial duties of [the employee's] regular occupation" for "at least the minimum

2

number of hours". (<u>Id.</u> at GLOSSARY-1.)  The minimum number of hours under the plan is thirty-five hours per week. (<u>Id.</u> at B@G-LTD-1.)  The "eligible group" at CVCC is "[a]ll [n]on-[s]easonal [e]mployees working ten months out of the year in active employment". (<u>Id.</u>)  An employee remains eligible under the Plan unless, <u>inter alia</u>, the employee is no longer (1) in an eligible group, or (2) engaged in "active employment". (<u>Id.</u> at EMPLOYEE-2.)

The Plan provides coverage for an eligible employee if, <u>inter alia</u>, the employee meets the Plan's definition of "disabled". (<u>Id.</u> at LTD-BEN-1.)  An employee is "disabled" if that employee is (1) "limited from performing the material and substantial duties of [the employee's] regular occupation due to [a] sickness or injury", and (2) "[the employee has] a 20% or more loss in [the employee's] indexed monthly earnings due to the same sickness or injury." (<u>Id.</u>)  "Limited" is defined as "what [the employee] cannot or [is] unable to do." (<u>Id.</u> at GLOSSARY-2.)  "Material and substantial duties" are those duties that (1) "are normally required for the performance of [the employee's] regular occupation", and (2) "cannot be reasonably omitted or modified." (<u>Id.</u>)  "Regular occupation" is the "occupation [the employee is] routinely performing when [the] disability begins . . . as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at

a specific location." (Id. at GLOSSARY-3.) An employee who meets this definition of "disabled" must also satisfy an "elimination period" of ninety days to be eligible for disability benefits under the Plan. (Id. at LTD-BEN-1.) The "elimination period" is defined as a "period of continuous disability which must be satisfied before [the employee is] eligible to receive benefits". (Id. at GLOSSARY-1.)

The employee continues to remain "disabled", moreover, only if, after twenty-four months of disability payments, the employee is "unable to perform the duties of any gainful occupation for which [the employee is] reasonably fitted by education, training or experience." (Id. at LTD-BEN-1.) "Gainful occupation" is "an occupation that is or can be expected to provide [the employee] with an income at least equal to 60% of [the employee's] indexed monthly earnings within 12 months of [the employee's] return to work." (Id. at GLOSSARY-1.)

The Plan also provides that disability payments will stop if, inter alia, (1) during the first twenty-four months of payments, the employee is able to work in the regular occupation on a part-time basis but chooses not to, (2) after twenty-four months of payments, the employee is able to work in any gainful occupation on a part-time basis but chooses not to, (3) the employee is no longer disabled under the terms of the Plan, or (4) the employee fails to submit proof of continuing disability.

4

(Id. at LTD-BEN-7.)  "Part-time basis" is defined in the plan as
"the ability to work and earn 20% or more of [the employee's]
indexed monthly earnings."  (Id. at GLOSSARY-3.)

The Plan does not provide disability coverage for
disabilities caused by certain events.  (Id. at LTD-BEN-8.)  A
disability caused by a pre-existing condition, for example, is
not covered under the Plan.  (Id.)  A pre-existing condition is
defined as "a condition for which [the employee] received medical
treatment, consultation, care or services including diagnostic
measures, or took prescribed drugs or medicines for [the]
condition during the given period of time as stated in the plan."
(Id. at GLOSSARY-3.)  The Plan further specifies that an employee
has a pre-existing condition if the employee (1) received
"medical treatment, consultation, care or services, including
diagnostic measures, or took prescribed drugs or medicines in the
3 months just prior to [the employee's] effective date of
coverage", or (2) has a disability that began "in the first 12
months after [the employee's] effective date of coverage."  (Id.
at LTD-BEN-8.)

An employee seeking disability benefits should provide
written notice of a disability claim within thirty days after the
date the disability begins.  (Id. at LTD-CLM-1.)  Further,
written proof of a claim must be submitted within ninety days
after the elimination period, or as soon as "reasonably

possible." (Id.)  The proof of claim must show (1) that the
employee is under the regular care of a physician, (2) the
appropriate documentation of the employee's monthly earnings, (3)
the date the employee's disability began, (4) the cause of the
employee's disability, (5) the extent of the employee's
disability, including restrictions and limitations preventing the
employee from performing the regular occupation, and (6) the name
and address of any hospital or institution where the employee
received treatment, including all attending physicians. (Id.)

The Plan confers discretionary authority to defendant, as
the claims administrator, to determine eligibility benefits and
construe the terms of the Plan. (Id. at CC.FP-1.)  Further, the
Plan provides that defendant will have the "broadest discretion
permissible" under ERISA and other applicable laws, when
exercising discretionary powers under the Plan. (Id. at ERISA-
6.)  The Plan, inter alia, also outlines defendant's process for
notification of an adverse benefit determination, appeal
procedures, as well as an employee's rights under ERISA. (Id. at
ERISA-3-6.)

## II.  Plaintiff's Employment and Alleged Disability

CVCC employed plaintiff as CVCC's "chief operating officer"
or "general manager" starting on July 8, 2002. (Def. Facts, at ¶
3.)  On August 31, 2002, plaintiff injured his lower back while
cleaning a storage area. (Id. at ¶ 99.)  Plaintiff sought

6

medical treatment for this injury in September 2002, and continued to receive medical treatment for this injury through November 13, 2002.  (Id. at  ¶¶ 101-104.)  On November 13, 2002, Scott Rushton, M.D. ("Rushton"), performed cervical spine surgery to resolve plaintiff's condition of cervical spondylosis with spinal stenosis and radiculopathy.  (Foster Aff., Ex. 2, Administrative Record ("Admin. R."), Operative Report, at UACL00101.)[1]

Plaintiff worked and conducted meetings from his home in December 2002 through mid-January 2003.  (Def. Facts, at ¶ 146.) Defendant contends that plaintiff was on "restricted duty" through February 2003, working mostly from home with "limited" hours at CVCC.  (Id. at ¶ 147.)  However, plaintiff states that he did not consider himself to be on "restricted duty", although he did work both at home and at CVCC during that time.  (Dkt. entry no. 14, Opp. Certification of Stephen Lane ("Lane Cert."), at ¶ 5.)  It appears that plaintiff returned to full-time work at CVCC in March 2003.  (Admin. R., Record of 3-24-04 Telephone Call with Plaintiff, at UACL00553.)

_____

[1] "Cervical" refers to the region of the neck.  Taber's Cyclopedic Medical Dictionary 354 (Clayton L. Thomas ed., 17th ed. 1993).  "Spondylosis" is "[d]egenerative arthritis, osteoarthritis, of the cervical or lumbar vertebrae and related tissues."  Id. at 1855.  "Stenosis" refers to a constriction or narrowing of a passage or orifice.  Id. at 1871.  "Radiculopathy" is "any diseased condition of [the] roots of [the] spinal nerves."  Id. at 1665.

Plaintiff visited Rushton, Philip Maurer, M.D., ("Maurer"), and Richard A. Balderston, M.D., as well as other physicians, to monitor the results of his surgery, as well as to seek treatment for neck pain, in May, June, July, August, and November of 2003. (Admin. R., 5-27-03 Visit Summary, at UACL00662; 6-12-2003 Visit Summary, at UACL00663; 6-26-2003 Visit Summary, at UACL00664; 7-17-2003 Visit Summaries, at UACL00666-65; 8-5-03 Visit Summaries, at UACL00668-67; 8-26-03 Visit Summaries, at UACL00670-69; 11-4-03 Visit Summary, at UACL00671.)  In July of 2003, plaintiff was diagnosed with arthritis at the left side of the C2-3 vertebrae. (Admin. R., 7-17-03 Visit Summaries, at UACL00666-65.)[2] Plaintiff also apparently received medical treatment at Duke Medical Center in August 2003, although there is no record of that visit.  (Def. Facts, at ¶¶ 110-112.)

Defendant contends that plaintiff was absent from work from August 7, 2003 through September 4, 2003; however, plaintiff denies that he was absent from work during that time period. (Def. Facts, at ¶ 149; Lane Cert., at ¶ 6.)  Rather, a record of a telephone call with plaintiff and defendant's representative notes that plaintiff said he missed only five days of work, and worked about twenty hours per week, in August 2003.  (3-24-04 Record of Telephone Call with Plaintiff, at UACL00553.)  Further,

---

[2] "C2-3" appears to refer to two of the cervical vertebrae of the spinal column.  Taber's Cyclopedic Medical Dictionary 354, 1845, 2125 (Clayton L. Thomas ed., 17th ed. 1993).

while defendant contends that plaintiff was on "restricted duty" the remainder of September 2003 and part of October 2003, plaintiff contends that he returned to full-time work in September 2003 and continued to work full-time through October 2003.  (Def. Facts, at ¶ 150; Lane Cert., at ¶ 7.)  Plaintiff's employment with CVCC ended in November 2003.  (Def. Facts, at ¶ 153.)

Plaintiff continued medical treatment for his condition after his employment at CVCC ended, seeking treatment from Rushton in February, May, and August of 2004.  (Admin. R., 2-10-2004 Visit Summary, at UACL00459; 5-20-04 Visit Summary, at UACL00458; 8-24-04 Visit Summary, at UACL00457.)  Plaintiff also began taking a graduate school class at Georgetown University sometime prior to February 2004.  (Def. Facts at ¶¶ 74, 76.)

**III. Plaintiff's Request for Benefits Under the Plan**

Plaintiff applied for disability benefits on January 12, 2004.  (Def. Facts, at ¶ 47.)  Plaintiff executed an "Employee's Statement", which represented, <u>inter alia</u>, (1) that plaintiff was employed with CVCC until November 26, 2003, (2) plaintiff's disability was due to "Work-related Injury/Sickness", and (3) that plaintiff "initially injured lower back cleaning storage area [and was] [s]ubsequently diagnosed and treated for [a] cervical injury."  (Admin. R., Employee's Statement, at UACL00765.)

9

Rushton submitted an "Attending Physician's Statement" on January 20, 2004, listing plaintiff's diagnosis as "s/p fusion cervical spine v45.4." (Admin. R., Attending Physician's Statement, at UACL00762.) The "Date First Unable to Work" query on the statement was left blank. (Id.) Rushton did note, however, that plaintiff was not released to work in plaintiff's occupation, or any occupation, and responded "unable to RTW [return to work]" to the "when should the patient be able to return to work" query. (Id.) Rushton answered that the nature of plaintiff's treatment was "s/p ant. + post. cervical fusion". (Id.) Rushton also filled in under "Restrictions" that plaintiff was "not cleared to return to work." (Id.) Under "Limitations", Rushton wrote "no heavy lifting, pulling, pushing. Not cleared to return to work." (Id.) These restrictions and limitations began "since surgery [on] 11-13-02". (Id.)

CVCC also submitted an Employer Statement dated January 7, 2004. (Admin. R., Employer Statement, at UACL00766.) According to this statement, plaintiff began employment with CVCC as "[g]eneral [m]anager/[chief operating officer] on July 8, 2002. (Id.) The effective date of plaintiff's coverage under the Plan is listed as November 1, 2002. (Id.) His last day of work is listed as November 26, 2003. (Id.) The "occupational classification" of plaintiff's position is listed as "Sedentary

1-10 lbs." (Id.) The statement also indicates that plaintiff's claim was the result of a work related injury or sickness. (Id.)

## IV. Defendant's Initial Claim Determination

### A. Review of the Material and Substantial Duties of Plaintiff's Occupation

Defendant first determined what the material and substantial duties of plaintiff's regular occupation were upon receiving plaintiff's claim. (Foster Aff., at ¶ 32.) Defendant considered (1) plaintiff's statements with regard to his duties, (2) information gathered from CVCC, including (a) statements from the president of CVCC, (b) a Job Description form submitted by CVCC, (c) plaintiff's employment contract, (d) plaintiff's resume, and (e) a generic job description for chief operating officer of a country club, and (3) a vocational analysis performed by Robin D. Giese, a vocational rehabilitation consultant, using the information in plaintiff's file, as well as the Dictionary of Occupational Titles and the 2003 Occupational Outlook Handbook. (Def. Facts, at ¶¶ 68-75, 77-82, 88-96.)

Defendant concluded that plaintiff's duties were to manage CVCC and provide entertainment to patrons, and this occupation was a "management type position which could be performed primarily while sitting down with brief periods of standing and/or walking." (Id. at ¶¶ 92, 94.) Other physical demands of plaintiff's occupation could include "reaching, handling, and fingering" and "exertion" of up to ten pounds. (Id. at ¶ 93.)

Also, although "supervision" of other CVCC employees was
required, "performing the material duties assigned to other
departments and/or department managers" was not.  (Id. at ¶¶ 95-
96.)

B.   **Review of Plaintiff's Medical Information**

Defendant then assessed whether the medical data supported
plaintiff's claim that he was limited from performing the
material and substantial duties of his regular occupation.
(Foster Aff., at ¶ 42.)  Defendant gathered plaintiff's medical
records from Rushton and other medical providers, and also
obtained information from plaintiff regarding his condition and
regular activities.  (Def. Facts, at ¶ 98.)

John LoCascio, M.D., Vice-President and Medical Director
("LoCascio"), conducted a medical assessment on defendant's
behalf based on all the information in plaintiff's file.  (Foster
Aff., at ¶ 43.)  LoCascio concluded that plaintiff would be
capable of sedentary or light work, but "over the shoulder work
would likely be precluded", and "the ability to change positions,
sit/stand every 30 to 60 minutes if needed would be common", and
that these restrictions and limitations would be stricter than
Rushton's proscription of "heavy" lifting, pulling, and pushing.
(Admin. R., LoCascio Report, at UACL00116-15.)  LoCascio also
noted that more stringent restrictions and limitations would not

be supported by plaintiff's medical and work history since his surgery.  (Id. at UACL00115.)

Both LoCascio and defendant also attempted to contact Rushton to clarify his statements on the Attending Physician's Statement and discuss LoCascio's findings, to no avail.  (Foster Aff., at ¶¶ 55-56.)

### C.  Defendant's Initial Claim Determination

Defendant ultimately concluded that plaintiff was not disabled within the meaning of the Plan, and sent plaintiff a letter explaining its decision.  (Admin. R., 5-21-04 Initial Denial Letter, at UACL00507-494.)[3]  Defendant determined that the material and substantial duties of plaintiff's position consisted of managing CVCC and providing entertainment for patrons.  (Id. at UACL00499.)  Defendant also determined that these duties (1) could be performed primarily while sitting, with brief periods of standing and walking, (2) required "exertion" of up to ten pounds, and (3) could include frequent reaching, handling, and fingering.  (Id.)  Defendant noted that plaintiff was not insured for other duties plaintiff said he was required to perform, such as mowing the lawn, picking things up off the floor, and sweeping tennis courts, as the Plan only insured for the duties of his

---

[3] There is an additional initial denial letter dated June 2, 2004 in the record.  (Admin. R., 6-2-04 Initial Denial Letter, at UACL00076-72.)  The Court will refer to the Initial Denial Letter dated May 21, 2004, however, as this is the letter defendant references in its papers.

occupation as they existed in the national economy.  (<u>Id.</u> at
UACL00496-95.)

Defendant further concluded that, based on plaintiff's
medical history, plaintiff "could perform full-time sedentary or
light work" with "the occasional lifting requirement of 10 pounds
and 20 pounds".  (<u>Id.</u> at UACL00496.)  Defendant also stated that
because of plaintiff's condition, plaintiff would "have some
difficulty with over shoulder level work."  (<u>Id.</u>)  Defendant
further stated that a reasonable limitation would be to allow
plaintiff "to shift positions, alternate between sitting and
standing, every 30-60 minutes".  (<u>Id.</u>)  Defendant then noted that
these restrictions and limitations were more restrictive than
those listed in Rushton's Attending Physician's Statement, which
proscribed heavy lifting, pulling, and pushing.  (<u>Id.</u>)

Defendant also noted Rushton's statement in the Attending
Physician's Statement that plaintiff was not cleared to return to
work.  (<u>Id.</u>)  Defendant concluded that this finding was not
supported by plaintiff's medical history and plaintiff's report
of his regular activities and physical abilities.  (<u>Id.</u>)  In
particular, defendant pointed to (1) plaintiff's "excellent"
result from surgery, (2) a "non-dermatomal pattern of pain", (3)
plaintiff's actual, successful, and sustained return to work
activities over a long period of time after the surgery, (4)
plaintiff's "excellent response to the lumbar epidural steroid
injection and the lack of recurrence" of that pain, (5) a lack of

14

further referral to a "physical medicine and rehabilitation
specialist or to a multi-disciplinary chronic pain assessment",
(6) the lack of a more definitive evaluation of applicable
restrictions and limitations to plaintiff's occupation, and (7)
plaintiff's participation in a weekly graduate school class at
Georgetown University.  (Id.)[4]

## V.   Defendant's Appeal Determination

Plaintiff retained counsel and appealed defendant's initial
claim determination in November 2004.  (Def. Facts, at ¶ 177.)
In December 2004, defendant received an additional six pages of
medical records documenting treatment plaintiff received from
Rushton from February 2004 through August 2004.  (Id. at ¶ 186.)

---

[4] Defendant contends that it could not properly assess (1)
plaintiff's effective date of coverage under the Plan, (2)
plaintiff's date of disability, (3) whether plaintiff remained
covered under the Plan throughout his employment, and (4) whether
the pre-existing condition limitation applied to plaintiff.
(Dkt. entry no. 10, Def. Br., at 7; Foster Aff., at ¶¶ 13, 59-
71.)  However, to continue to proceed with plaintiff's claim,
defendant states that it proceeded with the following
assumptions, under a full reservation of rights: (1) plaintiff
satisfied the waiting period and became covered under the Plan on
November 1, 2002; (2) plaintiff's disability commenced on
December 1, 2003, when plaintiff first experienced a 20% or more
earnings loss; (3) plaintiff remained covered under the Plan
through the date of disability; and (4) the pre-existing
condition limitation did not apply to plaintiff.  (Def. Br., at
7; Foster Aff., at ¶¶ 13, 72.)  At oral argument, the parties
explained that if this Court rules in favor of plaintiff on the
pending cross motions for summary judgment, the dispute will
still require resolution by the defendant (and if necessary by
the Court) of all those additional pending coverage issues
described in this footnote.  (Dkt. entry no. 19.)

Defendant again attempted to contact Rushton in January 2005, to no avail.  (<u>Id.</u> at ¶ 207.)

### A.   Second Review of Plaintiff's Medical Data

Plaintiff's file was referred to defendant's medical department for a second review in December 2004.  (<u>Id.</u> at ¶ 189.) Plaintiff's file was reviewed by (1) Bethany Washburn, R.N. ("Washburn"), an employee in defendant's medical department, and (2) Charles Sternbergh, M.D. ("Sternbergh"), a board certified neurosurgeon, who was not employed by defendant.  (<u>Id.</u> at ¶¶ 190-200, 201-04.)

Washburn issued a report assessing plaintiff's file on December 22, 2004.  (Admin. R., Washburn Report, at UACL00441-35.)  Washburn concluded that plaintiff was able to return to work approximately three months after surgery, as shown by, <u>inter alia</u>, (1) plaintiff's return to work following surgery until November 2003, (2) no significant worsening of plaintiff's cervical condition, despite plaintiff's continued neck pain, (3) no evidence of implant failure or loosening, (4) a normal motor and neurological exam, (5) no referrals had been made to a comprehensive pain management specialist, despite plaintiff's continued chronic pain complaints, and (6) a "70-75% improvement" in response to lumbar injections.  (<u>Id.</u> at UACL00436-35.)

Washburn further concluded that Rushton's restrictions and limitations as written in the Attending Physician's Statement

16

were "somewhat restrictive", given plaintiff's demonstrated
functional ability through November 2003 without any noted
worsening of his medical condition.  (Id. at UACL00436.)
Moreover, Washburn noted that the "major" change in plaintiff's
employment in November 2003 appeared to be that CVCC did not
renew his contract.  (Id. at UACL00436-35.)

Sternbergh issued his report on January 18, 2005.  (Admin.
R., Sternbergh Report, at UACL00427-26.)  Sternbergh assessed
plaintiff's medical history and concluded that, given reasonable
restrictions and limitations, plaintiff would be capable of
performing sedentary or light work from November 2003 through the
present.  (Id. at UACL00426.)  Sternbergh further noted that
"[n]ecessary accommodations would restrict flexion/extension
movements of the cervical spine, and all work must be organized
at or below shoulder level.  Repetitive bending or lifting would
be discouraged, and the claimant should be allowed to change
positions as necessary for comfort.  Lifting limitation would be
15 pounds occasionally." (Id.)  Sternbergh also made several
unsuccessful attempts to contact Rushton to discuss his findings.
(Id.)

   **B.   Second Review of the Material and Substantial Duties of
          Plaintiff's Occupation**

Defendant also had a second vocational assessment performed
by Richard Byard ("Byard"), a senior vocational rehabilitation
consultant, as part of its appeal determination.  (Admin. R., at

UACL00416-15.)  Byard issued his report on January 31, 2005, and
concluded that the material and substantial duties of plaintiff's
occupation were direct oversight for ongoing operations, fiscal
management, personnel management, marketing, and public relations
aspects of CVCC.  (Id. at UACL00416.)

Byard also concluded that (1) these duties were sedentary,
(2) these duties would not require any significant flexion or
extension motions of the cervical spine, (3) work above the
shoulder level would not be required, (4) the lifting demands of
the work would not exceed ten pounds, (5) no repetitive bending
or lifting would be required, and (6) the occupation would
generally provide the requisite level of flexibility needed to
accommodate frequent position changes as necessary.  (Id. at
UACL00415.)

## C.  Defendant's Determination on Appeal

Defendant affirmed its original determination in a letter
dated March 11, 2005.  (Admin. R., 3-11-05 Appeal Denial Letter,
at UACL00383-79.)  Defendant reviewed its findings and noted its
determination that plaintiff was not limited from performing the
material and substantial duties of his regular occupation as of
November 2003, and that "the major change at that time was that
[CVCC] would not renew [plaintiff's] contract."  (Id. at
UACL00380.)  Further, as an alternative basis for its
determination, defendant concluded that plaintiff had failed to

18

provide satisfactory proof of his claim in accordance with the terms of the Plan.  (Id. at UACL00379.)  Specifically, plaintiff failed to provide proof of his claim because: (1) Rushton did not reply to defendant's telephone calls and written communications to provide information regarding plaintiff's medical condition, and (2) plaintiff did not provide (a) a copy of an individual disability benefits claim file from plaintiff's other insurer, (b) medical records from plaintiff's treatment at Duke Medical Center, (c) graduate school transcripts, and (d) time sheets. (Id. at UACL00380-79.)

### DISCUSSION

**I.   Legal Standards**

    **A.   Summary Judgment Standard**

Rule 56(c) provides that summary judgment is proper if the pleadings, the discovery and disclosure materials, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  Id.  The summary judgment movant bears the initial burden of showing that there is no genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Once the movant has met this prima facie burden, the non-movant must set out specific facts showing that there is a genuine issue for trial.  Fed.R.Civ.P. 56(e)(2).  A non-movant must present actual evidence that raises a genuine issue of material fact and may not

rely on mere allegations.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477
U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable
to the non-movant when deciding a summary judgment motion.
<u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574,
587 (1986).  At the summary judgment stage, the Court's role is
"not . . . to weigh the evidence and determine the truth of the
matter but to determine whether there is a genuine issue for
trial."  <u>Anderson</u>, 477 U.S. at 249.  Under this standard, the
"mere existence of a scintilla of evidence in support of the
[non-movant's] position will be insufficient [to defeat a Rule
56(c) motion]; there must be evidence on which the jury could
reasonably find for the [non-movant]."  <u>Id.</u> at 252.  "By its very
terms, this standard provides that the mere existence of <u>some</u>
alleged factual dispute between the parties will not defeat an
otherwise properly supported motion for summary judgment; the
requirement is that there be no <u>genuine</u> issue of <u>material</u> fact."
<u>Id.</u> at 247-48 (emphasis in original).  A fact is material only if
it might affect the action's outcome under governing law.  <u>Id.</u> at
248.  "[T]here is no issue for trial unless there is sufficient
evidence favoring the nonmoving party for a jury to return a
verdict for that party.  If the evidence is merely colorable, or
is not significantly probative, summary judgment may be granted."
<u>Id.</u> at 249-50 (internal citations omitted).

**B.   Applicable Standard of Review**

ERISA permits a plan participant or beneficiary to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan". 29 U.S.C. § 1132(a)(1)(B).  The Court should review a denial of ERISA plan benefits under a de novo standard of review unless the benefit plan gives the administrator or fiduciary of the plan discretionary authority to determine benefits eligibility or construe the plan's terms.  Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989).  If the plan confers such discretion, the Court should apply a deferential "arbitrary and capricious" standard.  Id. at 111-12; Smathers v. Multi-Tool, Inc./Multi-Plastics, Inc. Employee Health & Welfare Plan, 298 F.3d 191, 194 (3d Cir. 2002).  Under the arbitrary and capricious standard, the Court must uphold the plan administrator's decision unless it was without reason, unsupported by substantial evidence or erroneous as a matter of law.  Pinto v. Reliance Stand. Life Ins. Co., 214 F.3d 377, 392 (3d Cir. 2000); Mitchell v. Eastman Kodak Co., 113 F.3d 433, 439 (3d Cir. 1997).  "This scope of review is narrow, and the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits."  Mitchell, 113 F.3d at 439 (alteration in original) (quotations and citations omitted).

21

"[I]n reviewing an ERISA plan fiduciary's discretionary determination regarding benefits, a court must take into account the existence of the structural conflict of interest present when a financially interested entity also makes benefit determinations." Kosiba v. Merck & Co., 384 F.3d 58, 64 (3d Cir. 2004).  Accordingly, an insurer that both funds and administers benefits is generally acting under a conflict that warrants the Court applying a heightened form of the arbitrary and capricious standard of review.  Stratton v. E.I. DuPont de Nemours & Co., 363 F.3d 250, 254 (3d Cir. 2004); Firestone, 489 U.S. at 115 ("[I]f a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a factor in determining whether there is an abuse of discretion.") (quotation and citation omitted). Thus, if a potential conflict exists, the Court must employ a "sliding scale" method and match its degree of scrutiny with the degree of conflict.  Kosiba, 384 F.3d at 64.

The Court must consider several structural factors when employing the "sliding scale" method: (1) the sophistication of the parties; (2) the information accessible to the parties; (3) the exact financial arrangement between the insurer and the company; and (4) the status of the fiduciary, as the company's financial or structural deterioration might negatively impact the presumed desire to maintain employee satisfaction.  Stratton, 363

22

F.3d at 254.  "All of these factors relate to whether the plan is
set up so that the administrator has strong financial incentives
routinely to deny claims in close cases- in short, whether the
administrator's incentives make treating it as an unbiased
fiduciary counterintuitive."  Post v. Hartford Ins. Co., 501 F.3d
154, 163 (3d Cir. 2007).

The Court also must examine the process by which the
administrator came to its decision to determine whether there is
evidence of bias.  Id. at 164.  The Court should consider
procedural irregularities such as (1) reversal of position
without additional medical evidence, (2) self-serving selectivity
in the use and interpretation of physicians' reports, (3)
disregarding staff recommendations that benefits be awarded, and
(4) requesting a medical examination when all of the evidence
indicates disability.  Id. at 164-65.  "In considering procedural
factors, the focus is whether, in this claimant's case, the
administrator has given the court reason to doubt its fiduciary
neutrality.  If it has, then the court must decide how much to
heighten its scrutiny."  Id. at 165.

## II.  Legal Standards Applied Here

### A.   Applicable Standard of Review

The Plan gives defendant authority and discretion to
interpret and construe its terms, including the provisions
establishing eligibility for benefits.  (Foster Aff., Ex. 1,

23

Plan, at CC.FP-1, ERISA-6.)   Therefore, the Court must review defendant's denial of plaintiff's request for benefits under the arbitrary and capricious standard of review.  See Firestone, 489 U.S. at 111-12; Smathers, 298 F.3d at 194.  However, because defendant both funded the Plan and determined eligibility under it, the Court must use the "sliding scale" method to determine whether a conflict exists warranting application of a heightened form of the arbitrary and capricious standard.  (Def. Br., at 14.)  See Kosiba, 384 F.3d at 64; Stratton, 363 F.3d at 254.

The fourth sliding-scale factor, which addresses the financial or structural deterioration of the plan fiduciary, is not relevant here.  See Stratton, 363 F.3d at 254.  With respect to the first factor, although plaintiff is a college graduate and has pursued graduate studies, he presumably did not possess a sophisticated understanding of the Plan's benefits, as did defendant, which presumably has handled many claims related to the Plan's benefits.  See id.  Thus this factor weighs in favor of a heightening of the arbitrary and capricious standard.

The second factor, however, does not support a heightening of the standard of review.  Plaintiff concedes that he had complete access to all information pertaining to his claim during defendant's claim review process.  (Def. Facts, at ¶¶ 41, 42, 46; dkt. entry no. 14, Pl. Response to Def. Facts, at ¶¶ 41, 42, 46.) See Stratton, 363 F.3d at 254.  Further, defendant's initial

24

denial letter and appeal denial letter reveal a "conscientious effort" by defendant to keep plaintiff "apprised of the information it had at its disposal and the reasons animating its decision to deny benefits." (See Admin. R., 5-21-04 Initial Denial Letter, at UACL00507-494; 3-11-05 Appeal Denial Letter, at UACL00383-379.)  See Stratton, 363 F.3d at 254.

The third factor weighs in favor of heightening the standard of review here.  Defendant funded and administered the benefits under the Plan, thus providing an incentive to deny CVCC's employees' claims under the Plan, as what defendant paid "came directly off its bottom line." (Def. Br., at 14.)  See Post, 501 F.3d at 164.  Moreover, a disincentive to deny claims was lacking, as defendant was an outside insurer, and thus less likely to feel the full effects of employee dissatisfaction with claims handling.  See id. at 163-64.

The Court also must determine whether defendant engaged in any procedural irregularities in processing plaintiff's claim. See id. at 164.  The first and third factors do not support increased scrutiny, as defendant did not reverse its position as to plaintiff's claim, and there is no evidence that defendant disregarded staff recommendations that the benefits be awarded. See id. at 164-65.  Further, defendant did not request a medical examination of plaintiff.  See id. at 165.  The second factor also does not support raising the level of scrutiny here.

25

Although defendant relied on the reports of its own medical personnel, it also relied on Rushton's Attending Physician's Statement, plaintiff's medical records, and had an independent medical assessment performed by Sternbergh, as discussed <u>supra</u>. <u>See id.</u>

Plaintiff argues that defendant's reliance on plaintiff's failure to submit certain documents to deny his claim "shows an obvious procedural irregularity" and suggests an "improper disposition to deny coverage" that warrants heightened scrutiny. (Dkt. entry no. 14, Pl. Opp'n Br. at 13, 14.)  However, the Plan sets forth that plaintiff was obligated to submit proof of his claim to defendant.  (Foster Aff., Ex. 1, Plan, at LTD-CLM-1.) It was not a procedural irregularity for defendant to rely on plaintiff's failure to comply with this provision of the Plan as a basis for denial of plaintiff's claim.

There were no procedural irregularities in the processing of plaintiff's claim that would warrant any heightening of scrutiny here, as discussed <u>supra</u>.  However, the structural factors do warrant a heightening of the arbitrary and capricious standard of review, as (1) defendant's sophistication was greater than plaintiff's, and (2) the financial arrangement between defendant and CVCC provided financial incentive for defendant to deny claims, as discussed <u>supra</u>.  Thus, the Court will apply a heightened arbitrary and capricious standard in reviewing the

denial of plaintiff's request for benefits to account for the structural conflicts that may exist here.  See Kosiba, 384 F.3d at 68.

### B.    Review of Defendant's Determination

Defendant's decision that plaintiff was not entitled to long-term disability benefits under the Plan was not arbitrary and capricious even when reviewed under a heightened standard. The record demonstrates that defendant considered the complete administrative record when determining plaintiff's claim, and supports defendant's decision that plaintiff's medical condition did not render plaintiff disabled as defined by the Plan.

Defendant considered input from many sources when determining what the material and substantial duties of plaintiff's regular occupation were, and concluded that these duties (1) consisted of managing CVCC and providing entertainment for patrons, and (2) were primarily sedentary, as discussed supra.

Plaintiff argues that defendant's determination was arbitrary and capricious because, "[e]ven accepting the description the description of [plaintiff's] job as formulated by [defendant]," defendant's assessment of plaintiff's duties failed to take into account the "long hours" and "significant amount of stress" of these duties, and that plaintiff's arthritic condition limited his ability to perform the duties at the required pace

27

and number of hours.  (Pl. Opp'n Br., at 3-4.)  Plaintiff also states that plaintiff "clearly performed more physically demanding tasks" as part of his occupation at CVCC.  (Id. at 4.)

The Court notes that, even if long hours, stress, and physically demanding tasks were a part of plaintiff's occupation as he performed it, the Plan defines "regular occupation" as the occupation "as it is normally performed in the national economy, instead of how the work tasks are performed for a specific employer or at a specific location."  (Foster Aff., Ex. 1, Plan, at GLOSSARY-3.)  There is no evidence either in the record or put forth by plaintiff that plaintiff's occupation as it is performed in the national economy entails physically demanding tasks, long hours, and stress.  Thus, defendant's determination as to what the material and substantial duties of plaintiff's regular occupation was not arbitrary and capricious.  Moreover, the Court also notes that plaintiff accepted defendant's description of his duties both when appealing defendant's initial denial, and for the purposes of plaintiff's motion for summary judgment.  (Dkt. entry no. 9, Pl. Br., at 7; dkt. entry no. 13, Def. Opp'n Br., at 17.)

Defendant also assessed all of the medical records it had before it, and determined that plaintiff was capable of performing the material and substantial duties of his regular occupation with reasonable restrictions and limitations,

28

including "no over the shoulder work, no lifting in excess of 10 pounds, no significant flexion or extension motions of the cervical spine, and the ability to change positions every 30 to 60 minutes as needed for comfort", as discussed supra. (Def. Br., at 21.)

Plaintiff contends that this determination was arbitrary and capricious because defendant failed to adequately consider the effect of plaintiff's arthritic condition in his neck and the pain resulting from that condition on his ability to perform his job duties. (Pl. Opp'n Br., at 5-10.) However, it is apparent from the record that defendant did consider plaintiff's neck pain and arthritis. (See Admin. R., Washburn Report, at UACL00440-36 (noting plaintiff's complaints of neck pain and diagnosis of arthritis), Sternbergh Report, at UACL00427 (same); 5-21-04 Initial Denial Letter, at UACL00497 (noting neck pain); 3-21-05 Appeal Denial Letter, at UACL00381 (same).)

There is evidence in the record, moreover, supporting defendant's determination that plaintiff's neck pain and arthritis did not render him disabled as defined by the Plan. For example, although plaintiff did visit physicians to address his neck pain and arthritis, no one stated that plaintiff was disabled as a result of his arthritis and neck pain. (See Admin. R., 5-27-03 Visit Summary, at UACL00662; 6-12-2003 Visit Summary, at UACL00663; 6-26-2003 Visit Summary, at UACL00664; 7-17-2003

Visit Summaries, at UACL00666-65; 8-5-03 Visit Summaries, at
UACL00668-67; 8-26-03 Visit Summaries, at UACL00670-69; 11-4-03
Visit Summary, at UACL00671; 2-10-2004 Visit Summary, at
UACL00459; 5-20-04 Visit Summary, at UACL00458; 8-24-04 Visit
Summary, at UACL00457.)

Rushton noted on November 4, 2003 that he thought plaintiff
was "certainly disabled from returning to his pre-surgical level
of occupation."  (Admin. R., 11-4-03 Visit Summary, at
UACL00671.)  However, he did not state that plaintiff was
disabled because of neck pain and arthritis.  (See id.)  Further,
the Attending Physician's Statement, dated January 20, 2004,
makes no mention of neck pain or arthritis; rather, it states
that plaintiff's diagnosis is "s/p fusion cervical spine v45.4",
apparently referring to plaintiff's surgery.  (Admin. R.,
Attending Physician's Statement, at UACL00762.)

Plaintiff also continued to work post-surgery, despite his
neck pain and eventual diagnosis of arthritis in July 2003.
(Lane Cert., at ¶¶ 6-8.)  In fact, it is defendant who asserts
that plaintiff was absent from work in August 2003, not
plaintiff.  (See id. at ¶ 6; Def. Facts, at ¶ 149.)  Moreover,
despite plaintiff's assertion that he worked despite the pain and
his assertion that "no viable medical alternative" remained
"except the constant ingestion of excessive amounts of Motrin" to
relieve the pain, the Court notes that Rushton and Maurer

30

recommended that plaintiff undergo physical therapy in August 2003.  (Dkt. entry no. 17, Pl. Reply Br., at 8; Admin. R., 8-5-03 Visit Summaries, at UACL 00668-67.)  Further, Rushton also recommended in February 2004 that plaintiff undergo "a more aggressive conditioning program."  (Admin. R., 2-10-2004 Visit Summary, at UACL00459.)

A record of a telephone call with plaintiff in February 2004 notes plaintiff's remarks that he did attend physical therapy; however, there is no record of any such treatment in the record. (Admin. R., 2-16-04 Record of Telephone Call, at UACL00683; Def. Opp'n Br., at 22.)  Further, it is noted in that record that he stopped attending physical therapy around February 2003 due to cost concerns.  (<u>Id.</u>)  Moreover, there is no evidence in the record of (1) plaintiff's participation in a conditioning program, or (2) as noted by defendant, a referral to a chronic pain management specialist to address plaintiff's continuing complaints of pain.  (Def. Br., at 25.)

Plaintiff also states that defendant acted arbitrarily and capriciously when it concluded that plaintiff's termination from employment was unrelated to his medical condition.  (Pl. Br., at 20-21.)  Plaintiff points to (1) CVCC's public statement to CVCC members, (2) the statements of a CVCC employee noting that plaintiff resigned because he was no longer unable to perform his job, (3) plaintiff's July 2003 performance review, and (4)

31

plaintiff's medical history as evidence that plaintiff's termination was related to his medical condition.  (Id.; Pl. Reply Br., at 9-10.)

There is evidence in the record supporting defendant's finding as well, however.  First, as noted in defendant's initial denial letter and appeal denial letters, there is substantial evidence in the record supporting defendant's conclusion that plaintiff's medical and work history did not support plaintiff's claim that he was disabled at the time his employment at CVCC ended.  (Admin. R., 5-21-04 Initial Denial Letter, at UACL00507-494; 3-11-05 Appeal Denial Letter, at UACL00383-79.)  Further, although the performance review notes that plaintiff's perception among some CVCC members as "distant" and "arrogant" could be attributable to an effect of plaintiff's medical condition on plaintiff's interaction with members, the performance review also notes (1) plaintiff's strengths, and (2) dissatisfaction with several aspects of plaintiff's performance, including plaintiff's appearance, management of CVCC employees, communication with the Board of CVCC, and management of food and beverage services, without mention of plaintiff's medical condition.  (Admin. R., 7-31-2003 Performance Review, at UACL00040-39.)

Defendant also relied upon a record of a telephone call with Michael Rosenberg, president of the CVCC Board of Trustees (the "Board"), noting Rosenberg's remarks that plaintiff had not

32

voluntarily resigned; rather, he had been "fired" because the Board was not satisfied with the "progress of the club." (Admin. R., 3-11-2004 Record of Telephone Call with Michael Rosenberg, at UACL00573.)  Thus, as there is substantial evidence related to the termination of plaintiff's employment supporting defendant's proposition, the Court cannot say that this determination was arbitrary and capricious.

Plaintiff also argues that defendant's determination was arbitrary and capricious because defendant disregarded Rushton's findings that plaintiff was unable to work.  (Pl. Br., at 19-20.) However, defendant was not required to accord special deference to Rushton's findings.  See Cerneskie v. Mellon Bank Long Term Disability Plan, 142 Fed.Appx. 555, 558 (3d Cir. 2005). Moreover, defendant is not required to explain why it disregarded Rushton's findings given that defendant credits reliable evidence that conflicts with Rushton's findings.  See Steele v. Boeing Co., 225 Fed.Appx. 71, 75 (3d Cir. 2007).  Such evidence included, inter alia, (1) the fact that plaintiff returned to work after surgery, and continued to work despite continuing neck pain and a diagnosis of arthritis in July 2003, (2) the fact that neck pain and arthritis was not listed as the diagnosis on the Attending Physician's Statement, (3) a lack of a referral to a chronic pain management specialist, given plaintiff's complaints of pain, (4) no medical records of physical therapy or a

33

conditioning program, even though such treatment was recommended by Rushton and Maurer, and (5) plaintiff's participation in a weekly class at Georgetown University. (Admin. R., CVCC Record of Work Days Missed by Plaintiff, at UACL00691; 3-24-04 Record of Telephone Call with Plaintiff, at UACL00553-52; Attending Physician's Statement, at UACL00762; 8-5-03 Visit Summaries, at UACL00668-67; 2-10-04 Visit Summary, at UACL00459.) The Court also notes that defendant attempted to contact Rushton several times throughout the claim determination process to discuss Rushton's findings as to plaintiff's condition, to no avail. (Foster Aff., at ¶¶ 55-56; Def. Facts, at ¶ 207.)[5]

Plaintiff also argues that defendant's determination was arbitrary and capricious because defendant did not examine

_____

[5] The Court notes that plaintiff attached to the Opposition Certification of Thomas E. Schorr, Esq., a letter dated August 25, 2006, from Rushton to plaintiff's counsel, concerning plaintiff's medical condition. (See dkt. entry no. 14, Opp'n Certification of Thomas E. Schorr, Esq., Ex. 1, 8-25-06 Letter.) This letter is dated almost one and a half years after defendant denied plaintiff's appeal, and thus was not part of the administrative record defendant used to determine plaintiff's claim. (See Admin. R., 3-11-2005 Appeal Denial Letter, at UACL00383-79.) Evidence that is not part of the administrative record generally is not admissible when determining whether a plan administrator's decision was arbitrary and capricious. Post, 501 F.3d at 168. The Court may, however, consider extrinsic evidence when deciding how much to heighten review of defendant's determination if that extrinsic evidence shows potential biases or conflicts. Id. Because this document does not show potential biases or conflicts, the Court will not consider it. See id. at 168-69 (noting that extrinsic evidence could not be considered if only relevant to whether administrator "reached the right decision").

plaintiff as part of its assessment of plaintiff's claim.  (Pl. Br., at 19.)  However, defendant was under no obligation to perform an independent medical examination of plaintiff.  See Delande v. ING Employee Benefits, 112 Fed.Appx. 199, 200-01 (3d Cir. 2004) (affirming district court's grant of summary judgment in favor of plan administrator where plan administrator did not conduct an independent medical examination of plaintiff); Marshall v. Conn. Gen. Life Ins. Co., No. 02-3662, 2005 WL 1463472, at *10 (E.D. Pa. June 17, 2005) ("[T]he decision to rely upon written submissions, rather than ordering an independent medical examination, fails to render a plan administrator's decision arbitrary and capricious.").

The Court thus finds that defendant's determination that plaintiff is not entitled to disability benefits under the Plan was not unreasonable, erroneous, or unsupported by substantial evidence, even after applying a heightened arbitrary and capricious standard of review.  See Pinto, 214 F.3d at 393 (explaining that in applying a heightened arbitrary and capricious standard of review, the court is "deferential, but not absolutely deferential"); Mitchell, 113 F.3d at 439.  Defendant followed the claims procedure set forth in the Plan in evaluating plaintiff's request, and responded to his appeal appropriately. Thus, the Court finds that plaintiff has failed to rebut the defendant's prima facie showing that the determination was

reasonable and the process utilized to reach this determination was proper.  See Pinto, 214 F.3d at 393 (stating that in applying a heightened arbitrary and capricious standard of review a court must "look not only at the result - whether it is supported by reason - but at the process by which the result was achieved").  Defendant therefore is entitled to summary judgment.[6]

### CONCLUSION

For the reasons stated supra, the Court will deny plaintiff's motion for summary judgment, and grant defendant's cross motion for summary judgment.  The Court will issue an appropriate order and judgment.


                                    s/ Mary L. Cooper
                              **MARY L. COOPER**
                              United States District Judge
**Dated:** March 17, 2008

---

[6] Defendant offered a "separate and independent" basis for denying plaintiff's claim based on plaintiff's failure to provide proof of his claim as required under the Plan.  (See Admin. R., 3-11-2005 Appeal Denial Letter, at UACL00380-79; Def. Br., at 27-29.)  Because the Court has determined that defendant's denial of plaintiff's claim on the basis that plaintiff was not disabled under the Plan was not arbitrary and capricious, the Court need not address whether this alternative basis for denying plaintiff's claim was arbitrary and capricious.